1  **STEIN, MITCHELL, CIPOLLONE, BEATO & MISSNER LLP**
   JONATHAN L. MISSNER, ESQ. (admitted *pro hac vice*)
2  ROBERT B. GILMORE, ESQ. (admitted *pro hac vice*)
   1100 Connecticut Avenue
3  Washington, D.C. 20036
   Telephone: (202) 737-7777
4  Facsimile: (202) 296-8312
   jmissner@steinmitchell.com
5  rgilmore@steinmitchell.com

6  **REID RUBINSTEIN & BOGATZ**
   I. SCOTT BOGATZ, ESQ.
7  Nevada Bar No. 3367
   CHARLES M. VLASIC III, ESQ.
8  Nevada Bar No. 11308
   3883 Howard Hughes Parkway, Suite 790
9  Las Vegas, Nevada 89169
   Telephone: (702) 776-7000
10 Facsimile: (702) 776-7900
   sbogatz@rrblf.com
11 cvlasic@rrblf.com

12 *Attorneys for Plaintiff, Affinity Gaming*

13              **UNITED STATES DISTRICT COURT**

14                   **DISTRICT OF NEVADA**

15

16 AFFINITY GAMING, a Nevada corporation,          **Case No.: 2:15-cv-02464-GMN-(PAL)**

17                              Plaintiff,         Chief Judge Gloria M. Navarro

18          vs.

19 TRUSTWAVE HOLDINGS, INC., a Delaware
   corporation,
20                                                      **(Hearing Requested)**
                              Defendant.
21

22          **PLAINTIFF AFFINITY GAMING'S OPPOSITION TO DEFENDANT**
23            **TRUSTWAVE HOLDINGS, INC.'S MOTION TO DISMISS**

24          Plaintiff Affinity Gaming ("Affinity") hereby sets forth its Opposition to Defendant

25 Trustwave Holdings, Inc.'s ("Trustwave") Motion to Dismiss [ECF 17].

26 …

*REID RUBINSTEIN & BOGATZ*
3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000 FAX: (702) 776-7900

REID RUBINSTEIN & BOGATZ

3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000 FAX: (702) 776-7900

## INTRODUCTION

In October 2013, Affinity, a Las Vegas-based casino operator, learned that it likely had suffered a breach of its data systems, potentially compromising the payment card information of its casino customers.  A novice when it came to cybersecurity attacks and data breaches, Affinity turned to Trustwave, one of a handful of "Payment Card Industry Forensic Investigators" – PFIs – to investigate, identify, and help remedy the breach, and to provide recommendations to help prevent future such attacks on Affinity's data systems.  Trustwave told Affinity that it was the company for the job – that it had the know-how and experience to assist Affinity, and that it would conduct a proper scope of services to investigate, diagnose, and help remedy the data breach Affinity had suffered.  Affinity believed and relied on those promises, and therefore hired Trustwave.  At the conclusion of its purported investigation, Trustwave provided Affinity a report in which, among other things, Trustwave claimed that (1) its investigation was complete; (2) the malware – the attacking software – had been removed from Affinity's system; (3) the breach was contained and the attack over; and (4) recommendations it had offered would address the vulnerabilities in Affinity's data systems that the attack had exploited.

None of Trustwave's claims proved to be true.  A short while after Trustwave's engagement ended, Affinity learned that the data breach it had suffered – the very one Trustwave had represented was contained and over – in fact was still ongoing.  Mandiant, the second cybersecurity investigation firm Affinity was forced to hire in the wake of this revelation, found that nearly all of Trustwave's representations were false, that Trustwave omitted key information it knew or recklessly disregarded, and that Trustwave's performance was woefully deficient, as Affinity detailed extensively in its Complaint.  Affinity has learned of many instances where Trustwave has engaged in similar conduct with prior clients – apparently, Trustwave's *modus opperandi* is to conduct quick-hit investigations with minimal expenditure of effort, where it is paid a tidy fee for what ultimately ends up being essentially worthless services.  Customers like Affinity are left with the consequences: angry customers, banks and regulators; significant fees

and penalties; and higher compliance and remediation costs.

Now, in its motion to dismiss, Trustwave seeks to evade all responsibility for clear and apparent misrepresentations and omissions, and grossly inadequate performance, regarding its supposed data breach investigation and remedial suggestions.   But its arguments rest on mischaracterizations of Affinity's Complaint and misstatements of applicable law.

*First*, whether Delaware law (which the parties' Agreement selects), or Nevada law, applies, should be deferred for purposes of this motion.  If Affinity prevails on its fraudulent inducement ground, Nevada law would apply, and thus to the extent Trustwave argues that application of Delaware law versus Nevada law requires dismissal of any of Affinity's claims (such as Affinity's Nevada Deceptive Trade Practices Act count), that argument is premature. Regardless, as Affinity demonstrates, its claims are actionable under either state's law.

*Second*, Affinity's fraudulent inducement and fraud claims are actionable.  Affinity pleads actionable misrepresentations and omissions that Trustwave made with knowledge, or in reckless disregard, of their falsity.  Affinity more than satisfies the fraud pleading standards under Rule 9(b), despite Trustwave's argument to the contrary (which Trustwave only asserts as to Affinity's fraudulent inducement claim, implicitly conceding that Affinity's other claims allege sufficient particulars as well).  The garden-variety integration clause in the Agreement does not contain the specific anti-reliance language that Delaware law requires to negate a fraudulent inducement claim (and Nevada law does not give effect to any such clauses against fraud in the inducement). Affinity's fraudulent inducement claim is not a "bootstrapped" fraud in the performance claim. And nor do Affinity's fraud claims merely target opinions; they deal with Trustwave's misrepresentations and omissions of fact.

*Third*, the economic loss doctrine does not preclude any of Affinity's tort claims. Trustwave admits that the doctrine has no application to fraudulent inducement.  Affinity's fraud, constructive fraud, and gross negligence claims target both Trustwave's contractual misrepresentations, as well as Trustwave's breaches of duties independent of its contractual

REID RUBINSTEIN & BOGATZ
3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000   FAX: (702) 776-7900

duties, and thus are not subject to the doctrine. And given Trustwave's role in providing specialized information on which it knew Affinity would rely, Trustwave's negligent misrepresentations are actionable under a well-recognized exception to the economic loss doctrine.

*Fourth*, Affinity's constructive or equitable fraud count states a claim. Affinity clearly pleads a special relationship with Trustwave, in light of Trustwave's specialized knowledge and skills and Affinity's unique vulnerability to and reliance on Trustwave's superior position.

*Fifth*, Affinity's breach of contract claims also are actionable. Trustwave simply is incorrect when it claims that Affinity did not point to specific clauses in the parties' Agreement that Trustwave breached. In addition, Trustwave's conduct breached the implied covenant of good faith and fair dealing with regard to Trustwave's statements and conduct not specifically referenced in the parties' Agreement. And while Trustwave argues the contract's supposed liability limitations apply, it ignores that Affinity has more than adequately pled Trustwave engaged in intentional, reckless, and grossly negligent conduct – conduct which Trustwave agreed would not be subject to liability limitations, and from which the law does not permit a party to shield itself contractually.

*Sixth*, Affinity's request for a declaration that Trustwave be liable for prospective losses that Affinity may incur is well within the ambit of the Declaratory Judgment Act.

The Court should deny Trustwave's motion in its entirety.

## FACTUAL BACKGROUND

Headquartered in Las Vegas, Affinity operates 11 casinos, including five in Nevada. Compl. ¶ 10. In October 2013, Affinity received information from law enforcement and banks that led it to conclude it may have suffered a breach of its information technology systems, potentially exposing the credit card information of its patrons. *Id.* ¶¶ 14-15. Affinity quickly contacted its insurance carrier, ACE, from which Affinity had procured a cybersecurity liability policy. *Id.* ¶ 16. ACE provided Affinity with a short list of approved Payment Card Industry

REID RUBINSTEIN & BOGATZ
3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000 FAX: (702) 776-7900

REID RUBINSTEIN & BOGATZ
3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000 FAX: (702) 776-7900

1  ("PCI") Forensic Investigation firms.  Among the firms listed was Trustwave. *Id.* ¶ 17. Trustwave
2  bills itself as a firm that "helps businesses fight cybercrime, protect data and reduce security risk.
3  With cloud and managed security services, integrated technologies and a team of security experts,
4  ethical hackers and researchers, we enable businesses to transform the way they manage their
5  information security and compliance programs." *Id.* ¶ 11.

6      Over the course of October 28-31, 2013, in telephone calls and emails, Trustwave
7  personnel "including Chris Hague, Grayson Lenik and Matthew Aronson, had multiple direct and
8  indirect conversations with Affinity Gaming personnel (including its Vice President of Insurance
9  and Benefits and Vice President of Information Technology)."  *Id.* ¶ 19.  "During those
10  conversations, Trustwave personnel represented that the company had the capabilities to, and
11  would, identify and help remedy the causes of the data breach, as well as facilitate Affinity
12  Gaming's implementation of measures to help prevent further such breaches." *Id.* ¶ 20.

13      Affinity needed to move quickly to retain a firm like Trustwave in order to investigate and
14  help address the data breach Affinity apparently had suffered.  Believing Trustwave, and
15  dependent on a company of its purported know-how and expertise, given Affinity's own lack of
16  same in the realm of cybersecurity and data breaches, Affinity hired Trustwave to investigate,
17  diagnose, and help remediate the data breach Affinity had suffered. *Id.* ¶¶ 21-24. Trustwave itself
18  set what the proper scope of its investigation should be in order to investigate and help remedy
19  the data breach, and Affinity wholly deferred to and trusted Trustwave that the scope Trustwave
20  prescribed would be appropriate and effective. *Id.* ¶¶ 32-33.

21      As part of the initial communications on October 28, 2013, Trustwave prepared and
22  presented to Affinity an "Incident Response Agreement" ("Agreement"), which Trustwave
23  insisted that Affinity execute before it performed any work.  Given the urgent nature of the data
24  breach and the serious negative consequences it faced, Affinity quickly acquiesced and signed the
25  contract.  Incident Response Agreement [ECF 17-1] executed as of October 31, 2013.  Among
26  other things, the parties' Agreement contained the following provisions:

- "In the Agreement, Trustwave agreed to undertake a 'PCI [Payment Card Industry] Forensic Investigation.' Trustwave represented that 'PCI Forensic Investigations are conducted on behalf of organizations that have a suspected compromise of their cardholder data environment,' and that 'PCI Forensic Investigations are designed to identify if, how, what, and for how long cardholder data has been compromised and to provide recommendations to increase security.'" Compl. ¶ 26; Agreement, "Service Description – PCI Forensic Investigation" [ECF 17-1 at 5];

- "Trustwave promised to provide a 'PCI Forensic Investigation [PFI] Report.' That PFI Report had as its deliverables a description of the techniques and forensic analysis performed, the 'technical findings,' and 'the conclusions of the investigation; has a compromise occurred; if so, what the evidence shows was the cause of the compromise; what data is at risk.'" *Id.* ¶ 27; Agreement, "Deliverables" [ECF 17-1 at 7];

- "Trustwave represented that its '[w]ork will be conducted in accordance with an agreement between Trustwave and the client,' and that it would use '[a] rigorous quality assurance process.'" *Id.* ¶ 28; Agreement, "About Trustwave SpiderLabs" [ECF 17-1 at 4]; and

- "Trustwave expressly warrantied in the Agreement that its "Services provided under this Agreement shall be performed with that degree of skill and judgment normally exercised by recognized professional firms performing services of the same or substantially similar nature." *Id.* ¶ 29; Agreement, T&C § 8(a) [ECF 17-1 at 14].

In January 2014, after the conclusion of its investigation, Trustwave provided Affinity with a "PCI Forensic Investigation [PFI] Report" that detailed its supposed investigation and findings. In its PFI Report, Trustwave described its scope of work and the systems it had inspected, and made a number of representations to Affinity, including the following critical statements:

- "Trustwave has completed 100% of [its] investigative efforts,"

- the data breach "***compromise has been contained***,"[1]

- "the malware" had been "removed"

- a "backdoor component appears to exist within the code base, ***but appears to be inert***."

- The breach had "ended" on October 13 when the attacker had exited the system.

---

[1] Emphasis added throughout unless otherwise noted.

Compl. ¶¶ 34-36.  Trustwave also made recommendations for Affinity to upgrade its security to help prevent similar such attacks.  *Id.* ¶ 37.

However, in April 2014, shortly after Trustwave's engagement was over, Affinity learned that, despite Trustwave's representations to the contrary, its data breach was still ongoing. Compl. ¶ 39.  Another vendor, Ernst & Young, had conducted a "penetration" test of Affinity's data security systems, which revealed that those systems still were infected with malware – the same malware that Trustwave had identified but claimed was no longer present.  *Id.* ¶ 40. Concerned about Trustwave's representations and performance, Affinity turned to a second PFI firm, Mandiant.  *Id.* ¶ 41.  Mandiant quickly moved to conduct a comprehensive investigation. And its conclusions regarding Trustwave's prior "investigation" and "findings" were startling – and damning.  Mandiant's investigation and report revealed the following:

- Trustwave asserted to Affinity that the firm "has completed 100% of [its] investigative efforts," *id.* ¶ 34, even though it knew that it had not fully investigated data it had collected from Affinity (as Mandiant found), let alone data Trustwave knew it had not even collected from Affinity, *id.* ¶ 50.

- Trustwave represented that the malware had been removed from Affinity's systems, Compl. ¶ 36, when in fact, Trustwave's own investigation indicated that examples of the malware were still infecting Affinity, as Mandiant later found as well, *id.* ¶ 56;

- Trustwave also represented that the compromise had been contained, the suspected backdoor inert, and the attack activity ended, *id.* ¶ 34, even though Trustwave knew that (1) it had not figured out how the attacker had maintained access to Affinity's system, (2) it suspected, but had not identified (let alone closed) a backdoor the attacker had maintained (and in fact had reactivated during Trustwave's engagement), and (3) had concluded that the exfiltration of data had taken place manually or "via through some undiscovered avenue," *id.* ¶¶ 50, 52-53, 55, 57.

Mandiant's report found numerous specific instances where Trustwave's statements were contradicted by information that Trustwave knew, or should have known, as detailed in the Complaint.  Compl. ¶¶ 46-66.

Trustwave's misrepresentations, omissions, and performance failures caused Affinity significant harm.  Based on Trustwave's supposed services and representations, Affinity had

REID RUBINSTEIN & BOGATZ
3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000 FAX: (702) 776-7900

communicated to banks and government regulators that the breach was contained and that it was implementing the measures Trustwave had recommended to help remediate the breach and prevent further such breaches. In response to the "second breach" – really the original breach that still was ongoing even after Trustwave had concluded its engagement – Affinity incurred significant additional costs, suffered significant reputational harm, and faced significant additional scrutiny and potential penalties from banks and regulators. Compl. ¶¶ 67-74. This harm continues, and Trustwave has refused to compensate Affinity for its losses. *Id.* ¶ 75.

As a result, Affinity filed suit, asserting causes of action for fraudulent inducement, fraud, constructive fraud, violation of Nevada's Deceptive Trade Practices Act (NRS Chapter 598), gross negligence, negligent misrepresentation, breach of contract, and declaratory judgment. Dec. 24, 2015 Complaint [ECF 1]. Trustwave has moved to dismiss all of Affinity's counts. Feb. 29, 2016 Motion to Dismiss [ECF 17].

### ARGUMENT

"When considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests." *Las Vegas Metro. Police Dep't v. Harris Corp., M/A Com*, No. 2:13-CV-01780-GMN, 2015 WL 895054, at *1 (D. Nev. Mar. 3, 2015) (Navarro, J.). "All allegations of material fact are taken as true and construed in the light most favorable to the plaintiff." *Johnson v. Lucent Techs., Inc.,* 653 F.3d 1000, 1010 (9th Cir. 2011). "To survive a motion to dismiss, 'a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.''" *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007)). For purposes of evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir. 1987). "Dismissal is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal

REID RUBINSTEIN & BOGATZ
3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000 FAX: (702) 776-7900

REID RUBINSTEIN & BOGATZ

3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000 FAX: (702) 776-7900

theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

As explained below, Affinity's Complaint clearly gives Trustwave fair notice of legally cognizable claims and the grounds on which they rest.  Trustwave's motion should be denied.

## I.   THE COURT SHOULD DEFER CHOICE OF LAW ISSUES UNTIL AFFINITY'S FRAUDULENT INDUCEMENT CLAIM IS RESOLVED.

As this Court held in *Fuoroli v. Westgate Planet Hollywood Las Vegas, LLC*, No. 2:10-CV-2191 JCM GWF, 2011 WL 1871236, at *1 (D. Nev. May 16, 2011), a case Trustwave cites, the Court should defer choice of law issues.  If Affinity prevails on its fraudulent inducement claim, then the parties' contract, including its choice of law clause, would be invalidated, and the Court would apply Nevada law.  "Depending on the merits of plaintiffs' claims, the court will ultimately either apply Florida law pursuant to the choice of law provision in the agreement between the parties, or, if the plaintiffs prevail and the contract is deemed invalid, the court will apply Nevada law." *Fuoroli*, 2011 WL 1871236, at *1.[2]  In particular, the Court in *Fuoroli* denied the defendants' motion to dismiss the plaintiff's fraudulent inducement claim.  The Court thus analyzed the parties' arguments under both states' law.

Affinity has stated actionable claims under either state's law, as demonstrated below, but to the extent that Trustwave argues that choice of law is decisive on any claim – as it does, for example, in seeking dismissal of Affinity's Nevada Deceptive Trade Practices Act claim, *see* Mot. at 21-22 – the Court should deny Trustwave's dismissal argument.  *Fuoroli*, 2011 WL 1871236, at *7 ("[I]f the court ultimately finds the contract invalid and applies Nevada law, the claim may be viable.  The motion to dismiss is thus also denied as to this claim [the Nevada DTPA count].").

---

[2] Absent an enforceable choice of law clause, there is no question Nevada law would apply: Affinity is a Nevada corporation headquartered in Las Vegas, and its computer systems that suffered the breaches and that Trustwave supposedly examined also are located within the state, and Trustwave's representations and investigation activity occurred overwhelmingly here as well.  *See Telecom Acquisitions Corp., I, LLC v. Int'l Hous. Dev. Grp., Corp.*, No. 2:05-CV-727-RLH-PAL, 2008 WL 2372480, at *9 (D. Nev. June 6, 2008) (applying Nevada's most significant relationship test under Restatement (Second) of Conflict of Laws § 148, and holding that Nevada law applied to fraud and misrepresentation claims under facts similar to those here).

REID RUBINSTEIN & BOGATZ

3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000  FAX: (702) 776-7900

## II.   AFFINITY'S FRAUDULENT INDUCEMENT AND FRAUD CLAIMS ARE ACTIONABLE.

To plead a claim for fraudulent inducement or fraud under Delaware law, a plaintiff must allege: "(1) a false representation, usually one of fact, made by the defendant; (2) with knowledge or belief of its falsity or with reckless indifference to the truth; (3) with intent to induce action or inaction; (4) that plaintiff's response was taken in justifiable reliance on the representation; and (5) an injury resulting from such reliance." *Alltrista Plastics, LLC v. Rockline Indus., Inc.*, No. CV N12C-09-094 JTV, 2013 WL 5210255, at *3 (Del. Super. Sept. 4, 2013).  Likewise, under Nevada law, a plaintiff must plead "that the defendant made a *false representation* to him, *with knowledge or belief* that the representation was *false* or without a sufficient basis for making the representation.  Further, the plaintiff must establish that the defendant *intended to induce the plaintiff to act or refrain from acting* on the representation, and that the plaintiff *justifiably relied* on the representation.  Finally, the plaintiff must establish that he was *damaged* as a result of his reliance." *Blanchard v. Blanchard*, 108 Nev. 908, 911, 839 P.2d 1320, 1322 (Nev. 1992) (emphases in the original).

Affinity more than adequately pleads its fraudulent and fraud claims; none of Trustwave's dismissal arguments have merit.

### A.   Affinity's Fraud Pleadings More Than Satisfy Rule 9(b).

Federal Rule of Civil Procedure Rule 9(b) requires pleading of the "who, what, when, where, and how" of the alleged fraud.  *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997); *see* Fed. R. Civ. P. 9(b).  In *Fecht v. Price Co.*, 70 F.3d 1078 (9th Cir. 1995), the Court of Appeals gave a straightforward example of what suffices to plead a fraud claim:  "a complaint alleging that the plaintiff bought a house from the defendant, that the defendant assured the plaintiff that the house was in perfect shape, and that the house was in fact built on landfill, would satisfy Rule 9(b)." *Id.* at 1083 (citation omitted).

Trustwave does not even assert that Affinity failed to meet Rule 9(b)'s requirements with respect to Trustwave's fraudulent conduct following the execution of the parties' Agreement.  *See*

Mot. at 12 (only asserting that the "Circumstances of the Alleged **Pre-Contractual** Misrepresentations Are Not Pleaded with Particularity").   And Trustwave's argument that Affinity does not plead its fraudulent inducement claims with the requisite particularity lacks any merit.   Affinity alleges that:

- during the course of "October 28-31, 2013," **[when]**

- executives of Trustwave – "Chris Hague, Grayson Lenik, and Matthew Aronson" **[who]**

- and "Affinity Gaming personnel (including its Vice President of Insurance Benefits and Vice President of Information Technology)" **[who]**

- had "multiple direct and indirect conversations" – i.e., face-to-face conversations, and exchanges by telephone and email – **[where]**

- "During those conversations, Trustwave personnel represented that the company had the capabilities to, and would, identify and help remedy the causes of the data breach;" **[what]**

- Trustwave also represented that it "had the capabilities, and would … facilitate Affinity Gaming's implementation of measures to help prevent further such breaches;" **[what]** and

- "These representations and omissions were false and deceptive.  Trustwave lacked the capabilities and experience necessary to perform its data security services under the Agreement and to conduct an appropriate investigation.  Trustwave did not perform an adequate investigation, and the contemplated scope of the engagement and nature of the services under the contract were not adequate for investigating, diagnosing, and helping to remedy Affinity Gaming's data breaches." **[how]**

Compl. ¶¶ 19-20, 77-79.  Affinity then goes on to describe in great detail the specific statements and actions of Trustwave, in particular as identified by the subsequent data security firm Mandiant, that demonstrated exactly how and to what extent Affinity's pre-contractual representations were not true.  *Id.* ¶¶ 46-66.  Trustwave references these allegations but then asserts counterfactually that they lack the "who, what, when, where, and how" of Affinity's pre-contractual fraud allegations.  That assertion is inexplicable; Affinity's pleading clearly satisfies Rule 9(b).

REID RUBINSTEIN & BOGATZ
3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000  FAX: (702) 776-7900

**B.**     **Affinity More Than Plausibly Pleads That Trustwave Made Its Representations Knowing They Were False Or Recklessly Disregarding Their Falsity.**

Affinity sufficiently pleads, pursuant to well-established standards, Trustwave's intent to engage in deceptive conduct.  As an initial matter, Trustwave improperly tries to impose the heightened pleading of Rule 9(b) on Affinity's intent assertions.  But, understandably, a plaintiff is not required to plead detailed specifics regarding a defendant's state of mind (or internal corporate awareness of culpability) in order to state a claim for relief.  Rule 9(b) states that intent only need be pled generally: "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  Courts in this circuit have rejected the argument Trustwave makes here that a plaintiff must plead the details of a defendant's state of mind.  *See Odom v. Microsoft Corp.*, 486 F.3d 541, 553-54 (9th Cir. 2007) (intent and knowledge only need to be pled generally under Rule 9(b)); *TRC & Associates v. NuSciences Corp.*, No. 13-6903, 2013 WL 6073004, at *6 (C.D. Cal. Nov. 18, 2013).

Under the proper standard, Affinity more than plausibly pleads that Trustwave acted intentionally or with reckless disregard of the truth.  With respect to the pre-contractual fraudulent statements, Affinity first pleads that, to induce Affinity to enter into the Agreement, Trustwave claimed it had the "capabilities and experience as a data security service provider to investigate, diagnose, and help remedy the data breach Affinity Gaming had suffered," when in fact Trustwave did not have such capabilities and experience, and that Trustwave knew this.  Compl. ¶¶ 19, 20, 78-79.  A defendant knows whether it in fact possesses the prerequisites for performing services under a contract, and thus an allegation that it knowingly lacked such requirements suffices to plead intent.  *Cf. No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.,* 320 F.3d 920, 942 (9th Cir. 2003) (knowledge of lack of capabilities and performance deficiencies supports inference of knowledge and intent).

Affinity next pleads Trustwave knew, or acted with reckless disregard of the truth, that it would not in fact be conducting an investigation sufficient to "investigate, diagnose, and help

REID RUBINSTEIN & BOGATZ
3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000 FAX: (702) 776-7900

remedy the data breach," Compl. ¶ 1, and that the recommendations it would be making in reality were not going to help prevent Affinity from suffering further data breaches of the sort it had experienced, *id.* ¶¶ 20, 78-79.  Affinity's allegations adequately plead Trustwave's knowledge, as they are similar to those this Court found sufficient in *Las Vegas Metro. Police Dep't.*  There, the plaintiff police department had contracted with the defendant to implement a new radio communications system for the police.  After the defendant utterly failed to live up to any of its promises or representations, the police department brought suit alleging fraudulent inducement, fraud, and breach of contract claims.  This Court denied the defendant company's motion to dismiss.  In particular, the Court found that the police department had adequately alleged "the defendant's knowledge or belief that the representation is false or knowledge that the defendant had an insufficient basis for making the representation" given the nature and extent to which "the performance and implementation of Defendants' radio system" did not comport with their representations.  2015 WL 895054, at *5 (citation omitted).

Here, the Complaint extensively catalogues Trustwave's knowingly circumscribed and inadequate investigation.  Compl. ¶¶ 46-66.  Like the allegations in *Las Vegas Metro. Police Dep't*, the extent to which Trustwave's performance was flawed and inadequate supports an inference that the firm knew, going into the engagement, that its capabilities and the scope of the services it was offering were not going to be up to the task, or at the very least Trustwave had "an insufficient basis for making [its] representation[s]."  2015 WL 895054 at *5.

And for these same reasons, Trustwave's similar misrepresentations and omissions of what it had done and found following commencement of the engagement support a plausible inference that Trustwave acted knowingly or with reckless disregard to the truth.  Contrary to Trustwave's assertion, Affinity's allegation that Trustwave "knew or should have known it had not diagnosed and remedied the source of the data breach or the suspected backdoors," Compl. ¶ 88, both comports with the legal standard for fraud (as both Delaware and Nevada law recognize intent or reckless disregard of falsity, *see supra* at 9), and has abundant factual support in

REID RUBINSTEIN & BOGATZ

3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000  FAX: (702) 776-7900

Affinity's pleading. *See supra* Factual Background. Affinity's allegations are not simply that a second data security firm did a better job than Trustwave. Instead, Affinity's claim is this: Trustwave had no honest basis to assert that the malware had been removed, the breach contained, the backdoor inert, or the security recommendations relevant, when – based on the information in Trustwave's possession and the firm's knowledge of the limited scope of its investigation and findings – it knew that such statements were not true, or at a minimum that it had "an insufficient basis for making [such] misrepresentations." *Las Vegas Metro. Police Dep't*, 2015 WL 895054 at *5.

### C. Because The Garden-Variety Integration Clause In The Agreement Lacks Express Anti-Reliance Language, It Does Not Foreclose Plaintiffs' Fraudulent Inducement Claim.

Trustwave argues that the Agreement's garden-variety integration clause precludes Affinity's fraudulent inducement claim, but both Delaware and Nevada law hold otherwise. Under Delaware law, "murky integration clauses, or standard integration clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations." *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1059 (Del. Ch. 2006). The Delaware Supreme Court held that *Abry Partners* "accurately states Delaware law" in this regard. *RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107, 119 (Del. 2012).

The only clause that Trustwave points to in making its argument is Section 11(l), entitled "Entire Agreement," claiming that "Affinity expressly disclaimed any such reliance in the Agreement" through that provision. Mot. at 14. However, Section 11(l) simply recites that "[a]ll prior or contemporaneous agreements, proposals, understandings and communications between Trustwave and Client regarding the subject matter hereof, whether oral or written, are superseded by and merged into this Agreement." Agreement § 11(l) [ECF 17-1 at 16]. Thus, that section merely is a "standard integration clause" and does not contain any "explicit anti-reliance representations at all." *Abry Partners,* 891 A.2d at 1059. Nowhere in this or any other provision

REID RUBINSTEIN & BOGATZ

3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000 FAX: (702) 776-7900

of the Agreement did Affinity explicitly represent that it was not relying on any pre-contractual representations by Trustwave in entering into the contract. "[T]he integration clause contained in Section [11(l)] merely states in general terms that the [ ] Agreement constitutes the entire agreement between the parties, and does not contain an unambiguous statement *by [Affinity]* disclaiming reliance on extra-contractual statements." *FdG Logistics LLC v. A&R Logistics Holdings, Inc.*, No. CV 9706-CB, 2016 WL 819215, at *13 (Del. Ch. Feb. 23, 2016) (sustaining fraudulent inducement claim) (emphasis in original). *See also Alltrista Plastics,* 2013 WL 5210255, at *3 (same). Thus, nothing in the Agreement forecloses Affinity's fraud in the inducement claim under Delaware law.

Nevada law also precludes Trustwave's argument. The Nevada Supreme Court has held unequivocally that "integration clauses do not bar claims for misrepresentation. Likewise, waiver clauses cannot bar a misrepresentation claim." *Blanchard*, 108 Nev. at 912, 839 P.2d at 1322-23. *See also Copper Sands Homeowners Ass'n, Inc. v. Copper Sands Realty, LLC,* No. 2:10-CV-00510-GMN, 2013 WL 3270430, at *7 (D. Nev. June 26, 2013) (Navarro, J.) (denying summary judgment, and rejecting defendants' argument that integration clause negated plaintiffs' justifiable reliance; "Plaintiffs correctly note in their Response, and Defendants do not refute in their Reply, that the Nevada Supreme Court has expressly recognized that 'integration clauses do not bar claims for misrepresentation.'") (citation omitted).

**D.    Affinity Has Not "Bootstrapped" Its Contract Claims Into Its Fraudulent Inducement Claims.**

Trustwave claims that Affinity "cannot 'bootstrap a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations.'" Mot. at 14 (citing *Iotex Commc'ns, Inc. v. v. Defries,* C.A. No. 15817, 1998 WL 914265, at *4 (Del Ch. Dec. 21, 1998)). But Affinity does not "merely alleg[e]" that Trustwave "never intended to perform its obligations." Affinity instead alleges that Trustwave misrepresented and concealed (1) that it had the capabilities and experience to conduct the

REID RUBINSTEIN & BOGATZ
3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000 FAX: (702) 776-7900

services for which it was hired, and (2) that the contemplated scope of its engagement, and the work it would perform, under the contract, would be adequate to investigate, identify, and help remedy the data breaches that Affinity had suffered. Compl. ¶¶ 20, 78. Affinity thus is not arguing that "fraud should be inferred based solely on an alleged pre-existing intent by [Trustwave] to breach the contract." *Osram Sylvania Inc. v. Townsend Ventures, LLC,* No. CV 8123-VCP, 2013 WL 6199554, at *16 (Del. Ch. Nov. 19, 2013) (rejecting "bootstrapping" argument). The court in *Alltrista Plastics* rejected the counterclaim-defendant's argument that an allegation of misrepresented ***capability*** to perform is the same as a mere allegation of ***intent not to perform*** – the same argument Trustwave makes here. "Although it is true that Delaware Courts have held that '[a] breach of contract claim cannot be turned into a fraud claim simply by alleging that the other party never intended to perform,' ***representing one's ability to manufacture a canister that will meet the needs of another party is a statement of fact, which, if false, can give rise to an intentional misrepresentation claim***." *Alltrista Plastics,* 2013 WL 5210255, at *4.

In any event, Trustwave overstates Delaware law in claiming that a pre-contractual intent not to perform never can be the basis for a fraudulent inducement claim. "'[S]tatements of intention ... which do not, when made, represent one's true state of mind are misrepresentations known to be such and are fraudulent." *Petroleum v. Magellan Terminals Holdings, L.P.*, No. CV N12C-02-302 FWW, 2015 WL 3885947, at *5 (Del. Super. June 23, 2015) (rejecting "bootstrapping" argument and sustaining fraudulent inducement claim). It is reasonable to infer that, based on its knowledge that it lacked the capabilities to perform the contract, and that the scope of its work would not suffice to accomplish its promised services, Trustwave had a present pre-contractual intent not to perform the contract it induced Affinity to enter.

Trustwave's argument fails under Nevada law as well. Although "'[t]he mere failure to fulfill a promise or perform in the future [ ] will not give rise to a fraud claim absent evidence that the promisor had no intention to perform at the time the promise was made," here, since

REID RUBINSTEIN & BOGATZ

3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000 FAX: (702) 776-7900

Trustwave "knew that the representations were false or that there was an insufficient basis for making such representations" when inducing Affinity to contract, Affinity's claims are actionable. *Las Vegas Metro. Police Dep't*, 2015 WL 895054, at *4 (sustaining fraudulent inducement claim).

### E.   Trustwave's Misrepresentations Were Not Opinions, But Rather Concerned Its Capabilities To Perform The Services, And The Adequacy Of The Scope Of Its Services.

Trustwave's misrepresentations that it had the capabilities and experience to conduct a proper PCI Forensic Investigation, and that the scope of its services would suffice for achieving the intended target, were not mere opinions, but false statements of fact, which induced Affinity to contract with the firm.  As noted above, the court in *Alltrista Plastics* found actionable the counterclaim-defendant's "alleged representations that it had the ability to manufacture canisters that would meet [plaintiff]'s needs, which were made prior to, and allegedly induced [plaintiff] into, the Supply Agreement."  2013 WL 5210255, at *4.  Affinity's comparable allegations against Trustwave similarly are actionable.  Nor is Affinity alleging merely that, as it turned out, Trustwave's scope of services was not adequate, as Trustwave incorrectly argues, *see* Mot. at 16. Rather, Affinity alleges that at the inception of the project, Trustwave knew the scope of services it was offering would not suffice to perform an adequate PCI Forensic Investigation – because Trustwave knew (or recklessly disregarded) that only examining a limited aspect of Affinity's data systems would not allow the firm to make accurate conclusions regarding the nature and extent of breach, or make accurate recommendations to help Affinity remedy the breach and avoid further attacks.  Such misrepresentations give rise to an actionable fraudulent inducement claim. *Las Vegas Metro. Police Dep't*, 2015 WL 895054, at *4.

### III.   THE ECONOMIC LOSS DOCTRINE DOES NOT APPLY TO AFFINITY'S TORT CLAIMS.

### A.   The Economic Loss Doctrine Does Not Apply To Fraudulent Inducement Claims.

Trustwave admits that fraudulent inducement is not subject to the economic loss doctrine. Mot. at 19 n.6.  *See also Alltrista Plastics*, 2013 WL 5210255, at *4.  Not only does this mean

that Affinity's fraudulent inducement count survives dismissal – as Trustwave's other arguments on this count all lack merit, *see supra* Argument § II – but it has an important consequence for Trustwave's effort to apply the economic loss doctrine to the rest of Affinity's claims.  If Affinity prevails on its fraudulent inducement count, and exercises its entitlement to rescission, then none of Trustwave's misconduct occurring while it performed its services would be pursuant to a valid contract, and thus the predicate for Trustwave's economic loss doctrine argument would be eviscerated.

**B.      Trustwave's Fraudulent Misrepresentations Contained In The Agreement Itself Are Actionable And Not Subject To The Economic Loss Doctrine.**

Trustwave misstates the law when it asserts that the economic loss doctrine forecloses fraud claims unless the plaintiff alleges "the breach of a duty independent of the duties imposed by the contract.'"  Mot. at 19 (citation omitted).  Delaware long has recognized that fraud claims are actionable *where the misrepresentations are included in the contract itself*.  *See RAA Mgmt., LLC v. Savage Sports Holdings*, 45 A.3d 107, 117 (Del. 2012) (distinguishing "fraud claims based on representations *outside* of a merger agreement--which *can* be disclaimed through non-reliance language--with fraud claims based on false representations of fact *within* the contract itself--which cannot be disclaimed") (emphasis in original) (internal quotations omitted); *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 137 (Del. Ch. 2009) ("Because of Delaware's strong public policy against intentional fraud, a knowingly false contractual representation can form the basis for a fraud claim, regardless of the degree to which the agreement purports to disclaim or eliminate tort remedies."); *see also Xu Hong Bin v. Heckmann Corp.*, No. 4637-CC, 2009 WL 3440004, at *11 (Del. Ch. Oct. 26, 2009).

Here, Trustwave promised, in the contract, that the "PCI [Payment Card Industry] Forensic Investigation" it performs is "designed to identify if, how, what, and for how long cardholder data has been compromised and to provide recommendations to increase security." Compl. ¶ 26 (quoting Agreement, ECF 17-1 at 5 (under "Service Description – PCI Forensic

Investigation (PFI))).  Trustwave also represented that it "scopes PCI Forensic Investigations in order to meet the requirements of the PCI Forensic Investigation program. Primarily, this means ensuring that sufficient data is collected and the data is investigated to sufficient depth in order to provide the necessary information for the PCI Forensic Report."  Agreement, ECF 17-1 at 6 (under "Scope and Project Phases – Project Scoping").  These representations were knowingly false, however, because Trustwave knew (or recklessly disregarded) that the limited scope of its engagement meant the firm could not possibly collect sufficient information and investigate sufficient systems to actually amount to a PCI Forensic Investigation and achieve the identified objectives.  *E.g.,* Compl. ¶¶ 50, 52, 61-66, 87-88.

Trustwave misrepresented, ***in the contract***, the nature of the work it would be performing and the adequacy of such work for its intended purpose.  These contractual misrepresentations are actionable as fraud or constructive fraud and are not subject to the economic loss doctrine.

### C.   Trustwave Breached A Duty To Disclose Information Necessary To Make Statements It Made Truthful, And Thus Its Fraud, Constructive Fraud, And Gross Negligence Claims Are Not Subject To The Economic Loss Doctrine.

Affinity's fraud claims relating to Trustwave's misrepresentations occurring after it began its services also state actionable claims and are not subject to the economic loss doctrine.  "[A] fraud claim alleged contemporaneously with a breach of contract claim may survive, so long as the claim is based on conduct that is separate and distinct from the conduct constituting breach." *Aviation W. Charters, LLC v. Freer*, No. CVN14C09271WCCCCLD, 2015 WL 5138285, at *6 (Del. Super. July 2, 2015).  Where the law imposes a duty of honesty independent from a contract, misrepresentations and omissions that breach such a duty are actionable as fraud and not precluded by the economic loss doctrine.  Thus, "a defendant can be liable for fraud by failing to disclose information necessary to make other statements made by that defendant not misleading." *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 154-55 (Del. Ch. 2004) (citing *Lock v. Schreppler,* 426 A.2d 856, 862 (Del. Super. 1981) ("Although there is no general duty to speak, nevertheless, if a person undertakes to speak, he then has a duty to make

a full and fair disclosure as to the matters about which he assumes to speak.")).   In *Metro Communications*, the defendants had made representations to the plaintiff about a permitting process for their telecommunications systems "with those defendants' knowledge that those statements were misleading because they failed to disclose information about the[ir] bribery."   *Id.*   The court held that "[o]nce those defendants undertook to communicate with Metro about the permitting process, they were under a duty to disclose all facts within their knowledge necessary to prevent the 1998 Management Reports from being misleading, including facts about the alleged illegal payments.   Their failure to disclose those facts constitutes actionable fraud by nondisclosure."   *Id.*

Trustwave is liable for fraud through non-disclosure, independent of the parties' Agreement, on the same grounds.   Trustwave represented that the scope of its investigation would be sufficient; Affinity's "data breach 'compromise had been contained' and the 'Malware: removed;'" "'that a "backdoor component appears to exist within the code base, but appears to be inert;'" "'that the attacker became aware of the security upgrades that were taking place and took several steps to remove both the malware and evidence of the attack itself;'" and that "'this activity ended the breach."   Compl. ¶¶ 34-36; *see also id.* ¶ 87.   But in making these representations, Trustwave omitted numerous material facts necessary to make its representations accurate:

- Trustwave's suspicion of a backdoor component, and identification of an open communication link that led outside of Affinity's systems, meant that in fact the compromise could not truthfully be said to be contained, nor could the attack truthfully be said to have been over, *id.* ¶¶ 52, 57-58, 87-88;

- Trustwave's limited investigation of only a subset of Affinity's data systems meant that Trustwave could not know whether, in reality, the malware was removed, or the backdoor inert, *id.* ¶¶ 53-62, 87-88;

- Given the knowingly incomplete nature of its investigation – and in particular, its known failure to identify the means by which the attacker had accessed Affinity's data

REID RUBINSTEIN & BOGATZ
3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000 FAX: (702) 776-7900

systems – the recommendations that Trustwave was making would not address the problems with Affinity's data security that the attack exploited, *id.* ¶¶ 65-66, 87-88.

Trustwave's provision of knowingly incomplete and misleading information, while omitting material facts that Affinity needed to know in order to act appropriately to secure its data and report on the nature of its data breach to banks and government regulators, gave rise to a duty by Trustwave to disclose such omitted information independent of its contractual obligations. Affinity's tort claims against Trustwave in this regard are not subject to the economic loss doctrine.

Trustwave also points to a statement in the contract that "Client acknowledges and agrees that [Affinity's] use of Trustwave's services does not guarantee PCI compliance or that its' [sic] systems are secure from unauthorized access." Mot. at 5. But this simply underscores that when Trustwave made misrepresentations in its PFI Report, issued after the parties' agreement, which **did** assure Affinity about the security of its systems (e.g., that the breach was contained, the malware removed, and the security recommendations would help prevent further unauthorized access, Compl. ¶¶ 87-88), those statements went beyond the contract and thus are not subject to the economic loss doctrine. In *Sea Star Line, LLC v. Emerald Equip. Leasing, Inc.*, No. CIV.A.05-245-JJF, 2006 WL 214206, at *10 (D. Del. Jan. 26, 2006), the district court rejected application of the economic loss doctrine, because the alleged misrepresentations, while made in the course of services for which the parties had contracted, occurred in reports that were made following the contract and which involved statements that went beyond what the contract provided. *Id.* at *10.

Nevada law, if it applies, would yield the same result. In Nevada, the economic loss doctrine "bars *unintentional* tort actions when the plaintiff seeks to recover purely economic losses." *Copper Sands Homeowners Ass'n, Inc.*, 2012 WL 1044311, at *4 (quoting *Terracon Consultants W., Inc. v. Mandalay Resort Grp.*, 206 P.3d 81, 86 (2009)). The economic loss doctrine does not, however, bar the recovery of purely economic losses when the defendant intentionally breaches a duty that is imposed independently of the obligations arising from

REID RUBINSTEIN & BOGATZ
3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000 FAX: (702) 776-7900

1    contract.  *Bernard v. Rockhill Dev. Co.,* 103 Nev. 132, 135, 734 P.2d 1238, 1240 (Nev. 1987).

2    Accordingly, Trustwave's misrepresentations and omissions founded on duties separate from the

3    parties' agreement are actionable under Nevada law as well.

4            **D.**       **Affinity's Negligent Misrepresentation Claim Is Not Subject To The**

5                    **Economic Loss Doctrine.**

6           The economic loss doctrine does not apply to Affinity's negligent misrepresentation

7    claim.  Under Delaware law, the economic loss doctrine does not bar claims for the tort of

8    negligent misrepresentation if (1) the defendant supplied the information to the plaintiff for use in

9    business transactions, and (2) the defendant is in the business of supplying information.

10   *Commonwealth Const. Co. v. Endecon, Inc.,* No. CIV.A. 08C01266RRC, 2009 WL 609426, at *4

11   (Del. Super. Mar. 9, 2009).  *See also Guardian Const. Co. v. Tetra Tech Richardson, Inc.,* 583

12   A.2d 1378, 1383 (Del. Super. 1990) (applying Section 552 of the Restatement (Second) of Torts

13   as exception to economic loss doctrine).  Because Affinity's negligent misrepresentation claim is

14   based on the common law duty to provide accurate information in commercial relationships, the

15   economic loss doctrine does not apply.  This conclusion is supported by *FleetBoston Financial*

16   *Corp. v. Advanta Corp.*, No. Civ.A 16912-NC, 2003 WL 240885 (Del. Ch. Jan. 22, 2003).  In that

17   case, FleetBoston entered into a contract for the acquisition of Advanta's credit card business.  *Id.*

18   at *l-2.  Soon after the contract closed, FleetBoston learned that the interest rates associated with

19   many of Advanta's accounts were miscoded, resulting in substantial losses to FleetBoston.  *Id.*

20   FleetBoston alleged that Advanta knew or should have known of the miscoding issue and brought

21   claims for both breach of contract and negligent misrepresentation.  *Id.*  Advanta argued that the

22   negligent misrepresentation claim should be dismissed because it overlapped the contract claim

23   and was barred by the economic loss doctrine.  *Id.* at *11.  In rejecting both of these arguments,

24   the court held that a contractual relationship does not necessarily displace all tort duties: "[i]f

25   (hypothetically) [the contract] had not required the disclosure of the liability caused by the

26   miscoding, Advanta ***would still have a duty arising in tort to disclose that information*** before

**REID RUBINSTEIN & BOGATZ**

3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000 FAX: (702) 776-7900

REID RUBINSTEIN & BOGATZ

3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000  FAX: (702) 776-7900

1   Fleet closed on the transaction.  For this reason, ***the misrepresentation was not rooted solely in***

2   ***the contract***." *Id*.[3]

3   Trustwave was in the business of providing data security information, and in this case

4   Trustwave did in fact provide Affinity such information, including a supposed analysis of the data

5   breach that Affinity had suffered, as well as supposed recommendations that purportedly would

6   improve Affinity's security.  Compl. ¶¶ 11, 20-27, 31-37.  And Trustwave knew, given its role as

7   a "Payment Card Industry Forensic Investigator," and given that Affinity's cyber liability insurer

8   had recommended Trustwave to Affinity, that Affinity would use, and rely on the accuracy of, the

9   information Trustwave would provide, as "it was important to Affinity's business relationships

10  with its customers and credit card companies, as well as its relationships with its governmental

11  regulators, that Affinity swiftly identify and resolve the data breach problem, so that Affinity

12  could minimize the risk that it would suffer fines, penalties and monetary claims as a result of the

13  breach."  Compl. ¶¶ 16-17, 23, 26.  Finally, Affinity relied, to its detriment, on Trustwave's

14  misrepresentations.  *Id.* ¶ 127.  Affinity has stated actionable negligent misrepresentation claims

15  that are not subject to the economic loss doctrine.[4]

16  **IV.   TRUSTWAVE'S SPECIALIZED KNOWLEDGE, AND AFFINITY'S UNIQUE VULNERABILITY
17         AND DEPENDENCE ON THAT KNOWLEDGE, SUPPORTS AFFINITY'S CONSTRUCTIVE
       FRAUD CLAIM.**

18  Affinity pleads that Trustwave had a special relationship with Affinity sufficient to

19  support Affinity's constructive fraud claim.  Under Delaware law, "[c]onstructive fraud is simply

20  a term applied to a great variety of transactions, having little resemblance either in form or nature,

---

21  [3] Other Delaware cases have reached similar conclusions. *See, e.g., Sea Star Line, LLC v. Emerald Equip.*
22  *Leasing*, Civ. No. 05-245-JJF-LPS, 2008 WL 4761871, at *3-4 (D. Del. Oct. 29, 2008) (holding that
    economic loss doctrine did not preclude negligent misrepresentation claim where the claim was
23  independent from the defendants' contractual obligations); *Sea Star Line, LLC*, 2006 WL 214206, at *9-10
    ("[T]he Court concludes that Emerald has pled sufficient facts to establish distinct torts arising
24  independently of the contractual obligations such that the claims are not definitively barred by the
    economic loss doctrine.").

25  [4] The Nevada Supreme Court also has recognized Section 552 of the Restatement. *Bill Stremmel Motors,*
26  *Inc. v. First Nat. Bank of Nevada*, 94 Nev. 131, 134, 575 P.2d 938, 940 (1978).  Under Nevada law,
    "[g]enerally, a claim for negligent misrepresentation is excluded from the economic loss doctrine."
    *Copper Sands Homeowners Ass'n, Inc.* 2012 WL 1044311, at *5.

-23-

REID RUBINSTEIN & BOGATZ

3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000 FAX: (702) 776-7900

which equity regards as wrongful, to which it attributes the same or similar effects as those which follow from actual fraud...." *In re Wayport, Inc. Litig.,* 76 A.3d 296, 327 (Del. Ch. 2013). "The principal factor distinguishing constructive fraud from actual fraud is the existence of a special relationship between the plaintiff and the defendant, such as where the defendant is a fiduciary for the plaintiff." *Id.* "To state a *prima facie* case for equitable fraud, plaintiff must therefore satisfy all the elements of common-law fraud with the exception that plaintiff need not demonstrate that the misstatement or omission was made knowingly or recklessly." *Zirn v. VLI Corp.,* 681 A.2d 1050, 1061 (Del. 1996). Similarly, under Nevada law, "'[c]onstructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others or to violate confidence.' Constructive fraud may arise when there has been "a breach of duty arising out of a fiduciary or confidential relationship." *Executive Mgmt., Ltd. v. Ticor Title Ins. Co.*, 114 Nev. 823, 841, 963 P.2d 465, 477 (Nev. 1998). But the relationship need not be a fiduciary one, so long as a relationship of "special confidence" is established. *Id.* (affirming dismissal of fiduciary duty count but reversing dismissal of constructive fraud count).

Trustwave claims that Affinity has not pled the existence of a special relationship, claiming the sole basis Affinity has pled is that "Trustwave had the ability to provide a service that Affinity could not perform itself." Mot. at 21. But that is a gross mischaracterization of the Complaint. Affinity was facing a data breach event that threatened the company with significant financial, reputational, and regulatory harm. Addressing the data security issues far outstripped Affinity's capabilities. Compl. ¶ 21. Affinity purchased a cyber insurance policy from an insurance carrier, ACE, to whom it turned for guidance and aid; its carrier recommended Trustwave. *Id.* ¶¶ 16-17. For these reasons, "Affinity Gaming was wholly dependent on, and subordinate in terms of its knowledge, understanding, and capabilities, to Trustwave, relying on Trustwave to investigate, diagnose, and prescribe appropriate measures to address, Affinity's apparently compromised data security." *Id.* ¶ 22; *see also* ¶ 97. "Trustwave claimed to possess

specialized knowledge, experience and qualifications regarding security for information technology systems and data," the firm knew that Affinity needed to and did rely on this specialized knowledge and qualifications, and Affinity was uniquely vulnerable to injury if Trustwave did not supply truthful and accurate information.  *Id.* ¶ 97.

These factual allegations suffice to plead the existence of a special relationship between the parties.  Trustwave claims that business parties in an arm's length transaction can never, as a matter of law, be in a constructive fraud relationship, *see* Mot. at 21, but that simply is incorrect.  For example, in *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504 (S.D.N.Y. 2014) *reconsideration denied*, No. 12-CV-7311 JPO, 2015 WL 1433373 (S.D.N.Y. Mar. 30, 2015), the district court sustained a constructive fraud count alleged by one bank to another, in an otherwise arm's length transaction involving the sale of collateralized debt obligations (CDOs), a complex debt instrument.  10 F. Supp. 3d at 524-25.  Even though the parties had disclaimed a fiduciary relationship, the Court found a constructive fraud duty still could exist, and denied the defendant's motion to dismiss.  The court observed that "[i]n a purely business transactions the defendant ... must have misled the plaintiff by false representations concerning the subject of his superior knowledge or expertise."  *Id.* at 524.  Because the plaintiff "alleges that [defendant] had superior expertise and experience as well as special access to relevant data and models that gave it superior knowledge in this transaction" the court found that the plaintiff "plausibly alleges that Defendants induced its investment through intentionally misrepresenting a material matter within Defendants' peculiar knowledge: Defendants' valuation of the CDO collateral."  Affinity's allegations are similar to those sustained in *LLBW*.  Given Trustwave's superior, specialized knowledge, and its representations of material matter within its peculiar knowledge (cybersecurity and data breaches), Affinity's allegations of a constructive fraud duty withstand Trustwave's dismissal argument.

## V.   AFFINITY STATES ACTIONABLE BREACH OF CONTRACT CLAIMS.

Trustwave's arguments to dismiss Affinity's breach of contract claims mischaracterize

REID RUBINSTEIN & BOGATZ
3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000 FAX: (702) 776-7900

REID RUBINSTEIN & BOGATZ
3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000 FAX: (702) 776-7900

Affinity's allegations, the parties' contract, and applicable law.

**A.      Affinity States Actionable Breach Of Contract Claims Based On Express Terms Of The Agreement.**

Trustwave claims that Affinity only references one clause of the parties' Agreement, and thus that is the only clause that can serve as the basis for Affinity's breach of contract claim.  But once again, Affinity's complaint states otherwise.  As detailed above, *see supra* Factual Background, Affinity identifies numerous specific provisions in the contract.  Compl. ¶¶ 26-29. Affinity goes on to explain in great detail how Trustwave breached these obligations.  Compl. ¶¶ 47-66.  In its breach of contract count, Affinity incorporates each of these allegations into its claim by reference, *id.* ¶ 129, and explicitly alleges that Trustwave breached these obligations, *id.* ¶¶ 130-132.  Thus, Affinity expressly cites numerous provisions of the contract that Trustwave breached.

**B.      Affinity's Claim That Trustwave Breached The Implied Covenant Of Good Faith And Fair Dealing Is Actionable.**

"The implied covenant of good faith and fair dealing inheres in every contract governed by Delaware law and 'requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.'"  *Alltrista Plastics, LLC*, 2013 WL 5210255, at *7-8 (citation omitted).  *Alltrista* demonstrates how Trustwave violated the implied covenant in this case.  In *Alltrista* the defendant withheld relevant information about the product at issue and did not cooperate with the plaintiff in identifying the cause of the product's failure.  *Id.*  The court observed that "'[t]he implied covenant does not apply when 'the subject at issue is expressly covered by the contract,'" but found that "because the contract lacks specific language governing the implied obligation here, [the defendant's] motion to dismiss [the plaintiff's] claim for breach of the implied covenant of good faith and fair dealing is ***denied.***"  *Id.* at *8 (emphasis added and citation omitted).

REID RUBINSTEIN & BOGATZ

3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000 FAX: (702) 776-7900

Here, Trustwave cannot have it both ways.  Obligations that it says are not present in the contract, but about which it made specific representations to Affinity, and which involved bad faith, dishonesty, and denial of Affinity of its justified expectations regarding the benefits of the parties' contract, *see supra* at 20, are actionable as breaches of the implied covenant.

**C.**     **The Agreement Does Not Exculpate Trustwave From Liability For Its Misconduct.**

Trustwave in its motion asserts that a reperformance warranty is the only remedy for its contractual breaches that Affinity can seek, but this argument fails for multiple reasons.  ***First***, by its terms, the reperformance obligation only applies to Trustwave's breach of its warranty that it will perform its services with "that degree of skill and judgment normally exercised by recognized professional firms performing services of the same or substantially similar nature" – as it expressly is limited only to the "skill and judgment" warranty.  Agreement, T&C § 8.a [ECF 17-1, at 14] ("The exclusive remedy for any breach of the ***foregoing warranty*** ….").  Thus, Trustwave's breaches of other provisions of the contract, described above, are not subject to this reperformance exclusive remedy.

***Second***, the Agreement expressly states that any purported limitations of liability and damages are themselves limited.  The Agreement provides that "Trustwave shall not be liable to client for (1) any acts or omissions ***which are not the result of Trustwave's gross negligence, recklessness or willful misconduct***."  Agreement, T&C § 9.a [ECF 17-1, at 15].  Thus, where Trustwave ***has*** engaged in gross negligence, recklessness or willful misconduct, as Affinity has alleged through well-pled claims, Trustwave's liability is not limited.

***Third***, it is well-established under Delaware law that a party cannot contractually immunize itself for intentional misconduct.  Under Delaware law, an agreement that "purports to limit" one party's "exposure for its own conscious participation in the communication of lies to" the counterparty is "invalid under the public policy of Delaware."  *Abry Partners*, 891 A.2d at 1064.  This accords with the Restatement (Second) of Contracts, which provides that "[a] term

REID RUBINSTEIN & BOGATZ

3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000  FAX: (702) 776-7900

exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy."  Restatement (Second) of Contracts § 195.

**VI.    AFFINITY STATES A PROPER DECLARATORY JUDGMENT ACTION CLAIM.**

Affinity requests a declaration, pursuant to 28 U.S.C. § 2201, that "Trustwave is liable to Affinity Gaming for any and all damages Affinity Gaming suffers in the future resulting from the undiagnosed and uncontained data breach" on the grounds that "Affinity Gaming faces the prospect of future monetary harm resulting from the fact that the data breach went undiagnosed and uncontained even after Trustwave claimed to have completed its supposed investigation." Compl. ¶¶ 137-138.  The Ninth Circuit has held proper a claim under 28 U.S.C. § 2201 seeking a declaration that a defendant is prospectively liable for future harm.  *See Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 893 (9th Cir. 1986) (reversing dismissal of declaratory relief claim).  Indeed, it is commonplace for declaratory judgment actions to address the question of prospective liability, such as whether an insurer has a duty to indemnify an insured in the future. *See, e.g., Am. States Ins. Co. v. Kearns*, 15 F.3d 142, 144 (9th Cir. 1994) (duty of prospective indemnification proper basis for Declaratory Judgment Act claim).  Affinity's Declaratory Judgment count should not be dismissed.

…

…

…

-28-

**CONCLUSION**

For the foregoing reasons, Affinity's claims in the Complaint all are actionable.  Affinity

respectfully requests that the Court deny Trustwave's motion to dismiss in its entirety.

DATED this 4th day of April, 2016.

<div style="margin-left:40%">

STEIN, MITCHELL, CIPOLLONE, BEATO &
MISSNER LLP

By:   /s/ *Robert B. Gilmore*
    Jonathan L. Missner, Esq. (admitted *pro hac vice*)
    Robert B. Gilmore, Esq. (admitted *pro hac vice*)
    1100 Connecticut Avenue
    Washington, D.C. 20036

-and-

REID RUBINSTEIN & BOGATZ
    I.  Scott Bogatz, Esq.
    Nevada Bar No. 3367
    Charles M. Vlasic III, Esq.
    Nevada Bar No. 11308
    3883 Howard Hughes Parkway, Ste. 790
    Las Vegas, Nevada 89169

*Attorneys for Plaintiff, Affinity Gaming*

</div>

REID RUBINSTEIN & BOGATZ
3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000 FAX: (702) 776-7900

## CERTIFICATE OF SERVICE

I, Kristee Kallas, declare that I am over the age of eighteen (18) and not a party to the entitled action.  On April 4, 2016, I served a true and correct copy of the following: **PLAINTIFF AFFINITY GAMING'S OPPOSITION TO DEFENDANT TRUSTWAVE HOLDINGS, INC.'S MOTION TO DISMISS**, via the Court's electronic case filing system to the following parties:

JAMES R. OLSON, ESQ.
THOMAS D. DILLARD, JR., ESQ.
OLSON, CANNON, GORMLEY,
ANGULO & STOBERSKI
9950 West Cheyenne Avenue
Las Vegas, NV 89129
Phone: 702-384-4012
Fax: 702-383-0701
jolson@ocgas.com
tdillard@ocgas.com

BRIAN P. KAVANAUGH, ESQ.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Phone: 312-862-2015
Fax: 312-862-2200
brian.kavanaugh@kirkland.com

I declare under penalty of perjury that the foregoing is true and correct.

/s/ *Kristee M. Kallas*
An Employee of Reid Rubinstein & Bogatz

REID RUBINSTEIN & BOGATZ
3883 Howard Hughes Parkway, Suite 790
Las Vegas, Nevada 89169
(702) 776-7000 FAX: (702) 776-7900